REPORTS

OF THE

# UNITED STATES TAX COURT

ESTATE OF LILLIAN BARAL, DECEASED, DAVID H. BARAL, ADMINISTRATOR, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 3618–10.          Filed July 5, 2011.

D's physician diagnosed her as suffering from dementia and determined that, because of her diminished capacity, she required assistance and supervision 24 hours a day for medical reasons, as well as for her safety. D's brother, her attorney-in-fact, hired caregivers to provide the necessary assistance. During 2007, the year at issue, D paid $760 to D's physicians and the New York University Hospital Center for medical care provided to D, $5,566 to D's caregivers for supplies, and $49,580 to D's caregivers for their services. *Held*: D paid $760 in 2007 to her physicians and the New York University Hospital Center for the diagnosis, cure, mitigation, treatment, or prevention of disease, and that amount was paid for medical care as defined in sec. 213(d)(1)(A), I.R.C., and was not reimbursed by insurance or otherwise. *Held*, *further*, P has not established that the $5,566 paid to D's caregivers for supplies was paid for medical care as defined in sec. 213(d)(1), I.R.C. *Held*, *further*, D was certified by her physician, a licensed health care practitioner, as requiring substantial supervision to protect her from threats to her health and safety because of her severe cognitive impairment, and therefore she was a chronically ill individual as defined in sec. 7702B(c)(2)(A), I.R.C. *Held*, *further*, the services provided to D by her caregivers were necessary maintenance and personal care services that she required because of her diminished capacity; were provided pursuant to a plan of care prescribed by a licensed health care practitioner; and therefore are quali-

1

fied long-term care services as defined in sec. 7702B(c), I.R.C. *Held*, *further*, the $49,580 paid to D's caregivers for their qualified long-term care services was an amount paid for medical care as defined in sec. 213(d)(1)(C), I.R.C.

David H. Baral, for petitioner.
*Scott A. Hovey*, for respondent.

OPINION

DAWSON, *Judge*: Respondent determined that decedent was liable for a $17,681 deficiency in Federal income tax and additions to tax of $3,107.47 under section 6651(a)(1), $1,173.93 under section 6651(a)(2), and $608.96 under section 6654(a) for 2007.[1] The issue remaining for decision is whether decedent may deduct as medical care expenses under section 213(a) the following amounts paid during 2007:[2] (1) $760 paid to decedent's physicians and the New York University Hospital Center; (2) $5,566 paid to decedent's caregivers for supplies; and (3) $49,580 paid to decedent's caregivers for their services. The payments for the caregivers' services are deductible if the services constitute qualified long-term care services as defined in section 7702B(c).

## *Background*

Some of the facts have been stipulated and are so found. The stipulation of facts and supplemental stipulation of facts and the exhibits attached thereto are incorporated herein by this reference.[3]

Decedent, Lillian Baral, was a resident of Queens, New York, when she died on August 28, 2008, at the age of 92.

_____

[1] Unless otherwise indicated, section references are to the Internal Revenue Code in effect for 2007, and Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Respondent conceded all additions to tax. In the petition, petitioner asserted that decedent was not required to file a Federal income tax return or pay Federal income tax for 2007 because she suffered from severe dementia and that the burden of proof was on respondent. Respondent filed a motion for summary judgment. Petitioner objected to respondent's motion. The Court granted respondent partial summary judgment that (1) decedent's mental incapacity did not excuse her from her obligation to file an income tax return and pay the tax and (2) petitioner has the burden of proof. In petitioner's objection, petitioner asserted that decedent was entitled to deductions for amounts paid for medical care and decedent's entitlement to a medical expense deduction was tried by consent of the parties.

[3] At the trial the parties filed a stipulation of facts but informed the Court that decedent's physician had not responded to their requests for decedent's records. The Court left the record open to give the parties additional time to obtain the records. The parties filed a supplemental stipulation of facts with the records attached as exhibits.

Her brother, David H. Baral, is the administrator of her estate. He resided in the District of Columbia when the petition was filed in this case. Mr. Baral handled all of decedent's personal and financial affairs under a power of attorney during the last years of her life. He wrote checks from her bank account to pay her bills.

Martin Finkelstein, M.D., was decedent's primary care physician from 2002 until her death. He diagnosed her as suffering from dementia and prescribed Aricept and Namenda, drugs usually prescribed for patients diagnosed with Alzheimer's disease or dementia. Decedent's hospital records indicate that the dementia had been diagnosed as early as 2004. In April 2004 decedent was hospitalized. Decedent's medical records show that when she was hospitalized she had not been compliant with taking her prescription medicines. Following another hospitalization in November 2004 she was evaluated so as to determine whether she was taking her medications properly and whether it was safe for her to live alone and so as to formulate a long-term plan of care.

A medical summary in Dr. Finkelstein's records dated May 1, 2007, shows that decedent had been evaluated on December 26, 2006.[4] The medical summary indicates that as of that December 26, 2006, (1) decedent's ability to communicate orally was impaired, (2) she was confused, (3) she required assistance with activities of daily living, (4) she required supervision due to her memory deficit, (5) she was at risk of falling and, therefore, could not be left alone, and (6) she required baseline homecare services.

Dr. Finklestein determined that, because of decedent's diminished capacity, she required assistance and supervision 24 hours a day for medical reasons and for her safety. Mr. Baral engaged a company recommended by Dr. Finkelstein to provide the required assistance to decedent. Margurita Pzevorski was one of the individuals sent by the company to provide decedent with the necessary care.

To reduce the cost of care, Mr. Baral terminated the company after a couple months (before the end of 2006) and hired Ms. Pzevorski directly to provide the necessary 24-

---

[4] Mr. Baral did not obtain Dr. Finkelstein's records for years other than 2007. Consequently, the record in this case does not include the results of evaluations of decedent's condition made before Dec. 26, 2006.

hour-a-day care. Ms. Pzevorski assisted decedent with bathing, dressing, trips to the doctor, taking her medications, and transferring to a wheelchair. Ms. Pzevorski took 5 weeks off during 2007. Another caregiver, Walters Emily Jakubowski, provided the 24-hour-a-day care for decedent during those weeks.

Ms. Pzevorski and Ms. Jakubowski also paid some of decedent's miscellaneous expenses and submitted receipts to Mr. Baral for reimbursement. Mr. Baral paid Ms. Pzevorski and Ms. Jakubowski for their services and reimbursed them for the supplies with separate checks drawn on decedent's bank account. During 2007 Mr. Baral paid Ms. Pzevorski and Ms. Jakubowski $40,760 and $8,820, respectively, for their services, and he reimbursed them $4,716 and $850, respectively, for decedent's expenses. In 2007, he also paid from decedent's account a total of $760 to Dr. Finkelstein and decedent's other physicians and to the New York University Hospital Center for her medical care. Decedent was not reimbursed by insurance or otherwise for the payments to the caregivers, the physicians, or the New York University Hospital Center.

Mr. Baral spoke on the telephone to decedent and her caregiver every day. Although decedent knew who Mr. Baral was and could communicate with him, the conversations were limited, and it was obvious to Mr. Baral that she had "lost her memory". Decedent's caregivers kept Mr. Baral informed of decedent's activities and condition. Decedent's caregivers were unrelated to her or Mr. Baral.

Decedent received the following income in 2007: (1) $245 interest income, (2) $29,331 ordinary dividends, (3) $13,239 capital gain, (4) $21,246 Social Security income, (5) $7,232 taxable distribution from an IRA, and (6) $33,355 distribution from a pension fund.

Decedent did not file a Federal income tax return for 2007 or pay Federal income tax for 2007. Nor did Mr. Baral, as decedent's attorney-in-fact, file a return on her behalf. Consequently, respondent filed a substitute for return for decedent pursuant to section 6020(b) on the basis of information provided by third parties. On November 9, 2009, respondent sent petitioner a notice of deficiency for 2007 in which he determined that decedent received $94,229 of income from third parties. Respondent further determined

that decedent was entitled to a personal exemption of $3,400 and a standard deduction of $6,650, resulting in an income tax deficiency of $17,681. The parties agree that decedent's adjusted gross income in 2007 was $94,229.

## *Discussion*

Certain expenses paid during the taxable year for the medical care of the taxpayer or a dependent (as defined in section 152) that are not compensated for by insurance or otherwise may be allowed as a deduction to the extent that the expenses exceed 7.5 percent of the taxpayer's adjusted gross income. Sec. 213(a). Decedent had adjusted gross income of $94,229 in 2007 and may be allowed a deduction of the amount paid for medical care that exceeds $7,067—7.5 percent of decedent's adjusted gross income.

As relevant here, medical care includes amounts paid for the diagnosis, cure, mitigation, treatment, or prevention of disease, and amounts paid for qualified long-term care services, as defined in section 7702B(c). Sec. 213(d)(1)(A), (C). During 2007 Mr. Baral paid from decedent's account $760 to New York University Hospital Center and decedent's physicians, including Dr. Finkelstein, for decedent's medical care. Those expenses were paid for the diagnosis, cure, mitigation, and/or treatment of decedent's disease and, therefore, constitute medical care expenses deductible under section 213(a). Mr. Baral also reimbursed Ms. Pzevorski and Ms. Jakubowski $4,716 and $850, respectively, for decedent's expenses. Although they gave him receipts for the expenses, he did not provide the receipts to the Court. He has not identified the expenses or otherwise substantiated that they are medical care expenses. Consequently, those reimbursed expenses are not deductible under section 213(a).

Mr. Baral also paid Ms. Pzevorski and Ms. Jakubowski $49,580 ($40,760 + $8,820) for their services to decedent. The caregivers are not licensed healthcare providers, and the payments to them were not for the diagnosis, cure, mitigation, treatment, or prevention of decedent's disease. However, the amounts paid to the caregivers are deductible if their services are qualified long-term care services as defined in section 7702B(c). See sec. 213(d)(1)(C).

"Qualified long-term care services" means necessary diagnostic, preventative, therapeutic, curing, treating, mitigating, and rehabilitative services and maintenance or personal care services required by a chronically ill individual and provided pursuant to a plan of care prescribed by a licensed health care practitioner. Sec. 7702B(c)(1). A "chronically ill individual" means any individual who has been certified by a licensed health care practitioner as (i) being unable to perform at least two of six specified activities of daily living (eating, toileting, transferring, bathing, dressing, and continence) for a period of at least 90 days due to a loss of functional capacity (the ADL level of disability); (ii) having a level of disability similar to the ADL level of disability as determined under regulations prescribed by the Secretary in consultation with the Secretary of Health and Human Services (the similar level of disability); or (iii) requiring substantial supervision to protect the individual from threats to health and safety due to severe cognitive impairment (cognitive impairment).[5] Sec. 7702B(c)(2).

A licensed health care practitioner means any physician, registered professional nurse, licensed social worker, or other individual who meets requirements that may be prescribed by the Secretary. Sec. 7702B(c)(4). Dr. Finkelstein, a physician, is a licensed healthcare professional. The December 2006 evaluation showed that decedent required assistance with activities of daily living but does not specify which activities of daily living. Thus, while we are unable to conclude that Dr. Finkelstein certified that decedent had the ADL level of disability, he diagnosed decedent as suffering from severe dementia; i.e., decedent was cognitively impaired. As early as 2004 her cognitive impairment prevented her from properly taking her prescription medicine.

---

[5] In respondent's pretrial memorandum it is asserted that petitioner had not substantiated the amount of decedent's medical care expenses for 2007, whether she was reimbursed for the expenses, or the medical nature of the expenses. Citing *Gardner v. Commissioner*, T.C. Memo. 1983–541, and sec. 1.213–1(e)(1)(ii), Income Tax Regs., respondent noted that "expenses incurred which are merely beneficial to the general health of an individual are not deductible." Further, citing *Borgmann v. Commissioner*, 438 F.2d 1211 (9th Cir. 1971), affg. T.C. Memo. 1969–129, respondent asserted that "the salary and cost of room and board for housekeepers hired on the advice of a doctor are not deductible medical expenses." At trial respondent asserted that petitioner had not established that (1) decedent's "significant body functions were impaired" during 2007 or (2) services were provided to decedent "pursuant to a plan established by a qualified health care professional". In a telephone conference held after the supplemental stipulation of facts was filed with the Court the parties stated that they did not wish to file briefs but would rely on the pretrial memorandums.

Failure to take prescribed medication posed a risk to decedent's health. Dr. Finkelstein certified decedent as requiring substantial supervision to protect her from threats to her health and safety due to her severe cognitive impairment. Therefore, decedent was a chronically ill individual as defined in section 7702B(c)(2)(A).

"Maintenance or personal care services" means any care that has the primary purpose of providing needed assistance with any of the disabilities that result in the individual's qualifying as a chronically ill individual, including protection from threats to health and safety due to severe cognitive impairment. Sec. 7702B(c)(3). The December 2006 evaluation showed that decedent required supervision because of her memory deficit. Dr. Finkelstein determined that decedent required 24-hour-a-day supervision to protect her from threats to her safety and health created by her dementia. Mr. Baral hired decedent's caregivers to provide the 24-hour care Dr. Finkelstein determined was necessary to protect her health and safety. The services provided to decedent by her caregivers were necessary maintenance and personal care services she required because of her diminished capacity and they were provided pursuant to a plan of care prescribed by a licensed health care practitioner. Therefore, they are qualified long-term care services as defined in section 7702B(c).

## *Conclusion*

We hold that the $49,580 paid in 2007 to decedent's caregivers for their qualified long-term care services was an amount paid for medical care as defined in section 213(d)(1)(C). Decedent also paid $760 in that year to her physicians and the New York University Hospital Center for their services. She was not reimbursed by insurance or otherwise for those payments, which totaled $50,340. Thus decedent had adjusted gross income of $94,229 in 2007 and may be allowed a deduction of $43,273—the amount paid for medical care that exceeds $7,067 (7.5 percent of decedent's adjusted gross income).

As previously stated, we hold that petitioner has not established that the $5,566 reimbursed expenses paid to decedent's caregivers are deductible as medical expenses under section 213(a).

To reflect the parties' concessions and our holdings herein,

*Decision will be entered under Rule 155.*